IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| CHARMAINE TOWANDA DAVIS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 18-5247 |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Charmaine Towanda Davis ("Davis" or "Plaintiff") seeks review, pursuant to 42 U.S.C.

§ 405(g), of the Commissioner of Social Security's ("Commissioner") decision denying her

claims for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act

and Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act.[1]  In

addition to opposing Davis' Request for Review, the Commissioner seeks to stay the

proceedings.  Doc. No. 19.  For the reasons set forth below, the Commissioner's Motion to Stay

will be denied.  Davis' Request for Review will be granted on the alternative grounds that the

Administrative Law Judge ("ALJ") who heard this case was not properly appointed in the

manner required by the Appointments Clause of the United States Constitution and that the

ALJ's opinion was not supported by substantial evidence.  This matter will be remanded to the

Commissioner for further proceedings consistent with this Memorandum Opinion, including a

---

[1]    In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the
undersigned United States Magistrate Judge conduct proceedings in this case, including the entry
of final judgment.  See Doc. Nos. 2, 6.

hearing before a different ALJ than the one who previously reviewed Davis' application; one who has been properly appointed pursuant to the Appointments Clause of the United States Constitution.

## I.    <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Davis was born on May 1, 1980. R. at 199.[2] She has a high school education and has completed a nine-month training program to obtain certification as a medical technician. <u>Id.</u> at 53-54. She applied for DIB and SSI benefits on October 17, 2014, <u>id.</u> at 19, alleging that she became disabled on April 1, 2013 due to: anxiety disorder, depression, hypertension, herniated disk and high cholesterol. <u>Id.</u> at. 203. Upon the completion of her training, Davis obtained a position as a medical technician in a prison in September 2016. <u>Id.</u> at 53-54, 263. Davis' applications were initially denied on April 1, 2015. She filed a written request for a hearing, <u>id.</u> at 101, and an ALJ held a hearing on her claim on August 9, 2017, <u>id.</u> at 32-63. At the hearing, Davis amended her claim through her attorney to a claim for a closed period of disability from April 1, 2013 through the time she returned to work on September 11, 2016. <u>Id.</u> at 35-36. On June 20, 2018, the ALJ issued an opinion denying Davis' claim. <u>Id.</u> at 19-26. Davis filed an appeal with the Appeals Council, which the Appeals Council denied on October 26, 2018, thereby affirming the decision of the ALJ as the final decision of the Commissioner. <u>Id.</u> at 1-6. Davis then commenced this action in federal court.

---

[2]    Citations to the administrative record will be indicated by "R." followed by the page number.

## II.    THE ALJ'S DECISION

In her decision, the ALJ found that Davis suffered from a severe impairment due to degenerative disc disease in her lumbar spine.  Id. at 22.  She also found that Davis had medically determinable impairments of obesity, affective disorder, and anxiety disorder but concluded that those impairments were not severe.  Id. at 22-23.  The ALJ concluded that neither Davis' degenerative disc disease, nor the combination of her impairments, met or medically equaled a listed impairment.  Id. at 23-24.  The ALJ found that, during the relevant period, Davis had the residual functional capacity ("RFC") "to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)," id. at 24, and that Davis, therefore, could perform her past relevant work as a cashier, id. at 26.  Accordingly, the ALJ found that Davis had not been disabled and denied Davis' claims for benefits during that period.  Id. at 26.

## III.    DAVIS' REQUEST FOR REVIEW

In her Request for Review, Davis asserts that the appointment of the ALJ who presided over her case did not comply with the Appointments Clause of the United States Constitution and that, pursuant to the recent United States Supreme Court decision in Lucia v. Securities and Exchange Commission, 138 S. Ct. 2044 (2018), her case must be remanded for a new hearing before a different, properly appointed ALJ.  In addition, Davis argues that the ALJ erred in the following respects: (1) finding that her mental impairments were not severe; and (2) finding that her past relevant work was as a cashier.

## IV.    SOCIAL SECURITY STANDARD OF REVIEW

The role of the court in reviewing an administrative decision denying benefits in a Social Security matter is to uphold any factual determination made by the ALJ that is supported by "substantial evidence."  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). A reviewing court may not undertake a de novo review of the Commissioner's decision in order to reweigh the evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). The court's scope of review is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's finding of fact." Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001).

Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988)); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005). The court's review is plenary as to the ALJ's application of legal standards. Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

To prove disability, a claimant must demonstrate some medically determinable basis for a physical or mental impairment that prevents him or her from engaging in any substantial gainful activity for a 12-month period. 42 U.S.C. § 1382c(a)(3)(A); accord id. § 423(d)(1). As explained in the applicable agency regulation, each case is evaluated by the Commissioner according to a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that

meets the duration requirements in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920 (references to other regulations omitted).

V.    **DISCUSSION**

A.    **The Commissioner's Motion to Stay Is Denied**

Davis argues, for the first time in this action, that the appointment of the ALJ who presided over her case did not comply with the Appointments Clause of the United States Constitution and that, pursuant to the Supreme Court's decision in Lucia, her case must be remanded for a new hearing before a different, properly-appointed ALJ.  Pl.'s Br. (Doc. No. 10) at 3-4.  The question of whether a Social Security claimant may raise an Appointments Clause challenge for the first time in a Request for Review filed in a federal district court pursuant to 42 U.S.C. § 405(g) has produced conflicting decisions by courts in this District.[3]  The undersigned

---

[3]    A number of district judges and magistrate judges in this District have held that a claimant may raise an Appointments Clause claim for the first time in district court.  See, e.g., Kellett v. Berryhill, No. 18-4757, 2019 WL 2339968 (E.D. Pa. June 3, 2019) (Rice, J.); Ready v. Berryhill, No. 18-04289, 2019 WL 1934874 (E.D. Pa. Apr. 30, 2019) (Lloret, J.); Culclasure v. Comm'r of Soc. Sec., 375 F. Supp. 3d 559 (E.D. Pa. 2019) (Kearney, J.); see also Order adopting report and recommendation, Perez v. Berryhill, No. 18-1907 (E.D. Pa. Apr. 23, 2019), ECF No. 21 (Savage, J.).  A number of other judges in this District have ruled to the contrary.  See, e.g., Marchant v. Berryhill, No. 18-035, 2019 WL 2268982 (E.D. Pa. May 28, 2019) (Kelley, J.); Muhammad v. Berryhill, 381 F. Supp. 3d 462 (E.D. Pa. 2019) (Pappert, J.); Cox v. Berryhill, No. 16-5434, 2018 WL 7585561 (E.D. Pa. Dec. 18, 2018) (Diamond, J.).

recently has expressed her opinion on this issue in a Report and Recommendation issued in

Pisacano v. Commissioner of SSA, No. 18-3182 (E.D. Pa. June 27, 2019), ECF No. 14, and will

not address the merits of that question again here.  The issue currently is under review by the

United States Court of Appeals for the Third Circuit in two consolidated cases: Bizarre v.

Berryhill, No. 19-1773 (3d Cir.) and Cirko v. Berryhill, No. 19-1772 (3d Cir.).

The Commissioner has filed a motion in this and other pending cases raising the

Appointments Clause issue, seeking a stay pending the Third Circuit's decision in Bizarre and

Cirko.  See, e.g., Doc. No. 19.  This Court also previously has expressed its opinion that a stay in

the numerous pending cases raising the Appointments Clause issue is not warranted because it

threatens to cause undue delay and hardship to claimants while it would not serve judicial

efficiency because it would create a backlog of stayed Social Security cases for the Court, thus

threatening even further delay.  See Report and Recommendation at 4-7, Fuentes v. Saul, No. 18-

3513 (E.D. Pa. Sept. 26, 2019), Doc. No. 24.  In the present case, the Commissioner's stay

argument carries even less weight because, as discussed infra in Section V(B)(3), this Court

would remand the case to the Commissioner regardless of the outcome of the Appointments

Clause issue due to substantive legal error in the ALJ's decision under review.  As a result,

staying the case until the Third Circuit issues its decision will only engender further, unnecessary

delay.

     **B.**     **The ALJ's Review of the Evidence Regarding Davis' Mental-Health Impairments Was Inadequate and Her Decision Not to Include Any Limitations in Davis' RFC to Address Those Impairments Is Not Supported by Substantial Evidence**

     **1.**     **The Medical Evidence Regarding Davis' Mental Health**

The medical opinion evidence in the record regarding Davis' mental-health impairments

is limited to the report of a consultative examiner, Dr. David Baker, R. at 388-94, and the review

of Dr. Baker's report conducted by a State agency examiner, Dr. George Ondis, id. at 67-68, 71-73. The record also includes treatment records for Davis' one-week voluntary commitment for mental-health treatment, which occurred approximately three weeks after Dr. Baker's examination. Id. at 397-98. The record does not contain, however, any records from Davis' treating mental-health providers.

**Dr. Baker**

Dr. Baker conducted a consultative examination of Davis on March 24, 2015. Id. at 388-91. Dr. Baker interviewed Davis regarding her history of mental-health problems and treatment. Id. at 388-89. Davis' reported depressive symptoms included: difficulty sleeping due to physical pain and racing thoughts; dysphoric moods all of the time; psychomotor retardation; crying spells; fatigue and loss of energy; loss of usual interests; difficulties in concentration; diminished sense of pleasure; and social withdrawal. Id. She also reported anxiety-related symptoms, including excessive apprehension and worry "about everything" and being fearful of not being around for her children. Id. at 389. Davis told Dr. Baker that she experienced transient suicidal ideation. Id. Davis reported a "history of illusions particularly at night" that involved seeing tigers on the walls at night. Id. She also reported short-term memory loss. Id.

In his mental status examination, Dr. Baker found Davis' appearance, dress, hygiene and motor behavior to be appropriate and her speech intelligibility to be fluent. Id. He indicated that her thought processes were coherent and goal-directed and her attention was intact. Id. at 390. Her intellectual functioning was average. Id. He also determined, however, that her affect was depressed, her mood was dysthymic and her memory skills mildly impaired. Id. She was able to recall three of three objects immediately, but none of those objects after five minutes. Id. Davis reported not having any hobbies or interests and that she spent her days in her home trying to

sleep.  Id. at 391.  Dr. Baker diagnosed Davis as suffering from "major depressive disorder, recurrent, severe, without psychotic features" and generalized anxiety disorder.  Id.  He recommended that Davis continue with psychological and psychiatric treatment and predicted that her prognosis was "[f]air, if continued cooperation with treatment."  Id.  Dr. Baker concluded that: "[t]he results  of the present evaluation appear to be consistent with psychiatric and cognitive problems and this may significantly interfere with the claimant's ability to function on a daily basis."  Id.

Dr. Baker's report included a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  Id. at 392-94.  In that statement, he rated Davis as having mild limitations in her abilities to: understand and remember simple instructions; carry out simple instructions; make judgments on simple work-related decisions; and interact appropriately with the public, supervisors and coworkers.  Id. at 392-93.  He rated Davis as having moderate difficulties in understanding and remembering complex instructions.  Id. at 392.  He also rated her as having marked limitations in the abilities to carry out complex instructions and to respond appropriately to usual work situations and to changes in a routine work setting.  Id. at 393.

### Dr. Ondis

The State agency physician who reviewed Davis' records, Dr. Ondis, was limited, in the absence of any treatment records, to reviewing the results of Dr. Baker's examination.  See id. at 65-66.  In evaluating the "B" criteria of the relevant Mental Disorder Listings,[4] 20 C.F.R. pt.

_____

[4]    The Commissioner's Mental Disorder Listings are divided into "A" criteria, which set out the medical evidence necessary to show that a claimant suffers from one of the listed mental-health disorders, 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(a), and "B" criteria, which are used to measure the extent to which the claimant's mental disorder limits his or her functioning, id. § 12.00(A)(2)(b).  The "B" criteria are the abilities to: "understand, remember, or apply

(Footnote continued on next page)

404, subpt. P, app. 1, § 12.00, Dr. Ondis concluded that Davis had medically determinable impairments from an affective disorder and an anxiety disorder and that both those impairments were severe. R. at 67. He found that Davis suffered from mild restrictions in her activities of daily living and that she had moderate restrictions in social functioning and in maintaining concentration, persistence or pace. Id.

More specifically, Dr. Ondis rated Davis as "not significantly limited" in her abilities to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention and concentration for extended periods;[5] perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. Id. at 71-73. Dr. Ondis also rated Davis, however, as having moderate restrictions in her abilities to: understand and remember detailed instructions; carry out detailed instructions; complete a normal workday

information; interact with others; concentrate, persist or maintain pace; and adapt or manage oneself." Id. § 12.00(A)(2)(b). To meet the criteria of a listing, the claimant's mental disorder must result in an "extreme" limitation in one of the criteria or a "marked" limitation in two of the criteria. Id.

[5]    Dr. Ondis did not provide an explanation for the discrepancy between his opinion that Davis had moderate restriction in her ability to maintain concentration, persistence or pace, R. at 68, and his subsequent rating of her "sustained concentration and persistence limitations" as not significantly limited, id. at 71.

and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. Id. Dr Ondis concluded that although Davis' stress tolerance was "likely to be limited" and she "may have some difficulty adjusting to sudden and unexpected changes," "the limitations resulting from Davis' [mental] impairment d[id] not preclude [her] from performing the basic mental demands of competitive gainful activity." Id. at 73.

**Davis' Voluntary One-Week Commitment**

Less than one month after Dr. Baker issued his report, on April 19, 2015, Davis' sister brought her to Temple Hospital, id. at 397, where she was voluntarily committed for a period of one week, id. at 397-99. A mental status examination conducted at the time of her admission reflected that Davis was "in distress." Id. at 397. She made poor eye contact, although she was cooperative. Id. Her speech was spontaneous but weak, her mood was depressed, and her affect constricted and depressed. Id. Davis' thought processes were coherent and goal-directed, but she reported auditory hallucinations telling her to kill herself. She admitted to suicidal ideation and a plan to overdose on pills. Id. She reported that she had made two prior unsuccessful attempts to kill herself by overdosing on Xanax, in January 2014 and February 2014, and stated that she currently wished to be dead. Id. Davis' sensorium was clear and her insight and judgment were both poor. Id. At the time of her admission, the examining doctor rated her GAF score as 20.[6] After a week of inpatient treatment, Davis' "symptoms gradually improved and

---

[6]   "A GAF score is a 'numerical summary of a clinician's judgment of [an] individual's overall level of functioning.'" Rivera v. Astrue, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014) (quoting American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders 32

(Footnote continued on next page)

subsequently resolved," and her mental status exam became unremarkable other than reflecting only partial insight and judgment.  Id. at 399.  Her GAF score at the time of discharge was rated as 60.[7]  She was discharged with a prescription for an increased dosage of Zoloft after making a follow-up appointment with her mental-health providers at Cognitive Behavioral Services.  Id.

### 2.  The ALJ's Analysis of Davis' Mental-Health Impairments

The ALJ decided at step two of the sequential analysis that Davis' mental-health impairments were not severe.  Id. at 22-23.  Applying the "B" criteria of the Mental Disorder Listings, see 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00, the ALJ found that Davis had no limitations in her abilities to understand, remember or apply information or in adapting or managing oneself, and that she had only mild limitations in interacting with others and in concentrating, persisting or maintaining pace.  R. at 23.  As her support for those findings, the ALJ provided the following analysis:

> She was able to do household chores including cooking, cleaning, sweeping, mopping, and doing laundry.  She used public transportation independently, shopped in stores for groceries, and handled her own finances.  She was able to go to school and complete a medical assistant course for about nine months.

Id.

The ALJ addressed Dr. Baker's consultative examination report but decided to give it "little weight."  Id. at 22-23.  In so doing, she stated that Dr. Baker had found "no significant

---

(4th ed. 2000) [hereinafter "DSM-IV"]).  A GAF rating of 20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute)."  DSM-IV at 34 (emphasis and unnecessary capitalization omitted).

[7]   A GAF rating of 60 indicates "[m]oderate (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 34 (emphasis and unnecessary capitalization omitted).

abnormalities." Id. at 22. She also asserted that "there is no record of [Davis] receiving any ongoing mental[-]health treatment from a mental[-]health professional." Id. The ALJ pointed to what she found to be inconsistencies in the record regarding whether Davis took psychotropic medications, stating: "[t]he claimant testified that she no longer takes psychotropic medication. However, she stated in the record that she takes psychotropic medications, but there is no menton of who prescribed these . . . ." Id. The ALJ noted that Dr. Baker had found Davis had marked limitations in carrying out complex instructions, making judgments on complex work-related decisions and responding appropriately to usual work situations and to changes in a routine work setting. Id. She concluded her discussion, however, by stating: "I give the [Medical Source Statement] of Dr. Baker little weight as these significant limitations are not supported by the findings of his examination nor anywhere else in the record in this case." Id. at 22-23. Although the ALJ repeated in her discussion of Davis' RFC essentially the same paragraph regarding Davis' daily activities quoted above as to the "B" criteria, she provided no further explanation for her decision not to include any restriction in Davis' RFC relating to Davis' mental impairments. Instead, she concluded that Davis could perform the full range of light work. Id. at 24.

### 3. The ALJ's Evaluation of Davis' Mental Health Was Inadequate

An ALJ is required to support his or her conclusions with substantial evidence. In so doing, the "ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his [or her] conclusion sufficient to enable meaningful judicial review." Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)). That explanation must be sufficient to allow a reviewing court to determine that the ALJ's decision was supported by substantial evidence. Burnett, 220 F.3d at

119-20.  "Although the ALJ need not explicitly weigh every item of medical evidence in the file, he [or she] must explain his [or her] rejection of competent evidence supporting the Plaintiff's claims."  Berrios-Vasquez v. Massanari, No. 00-CV-2713, 2001 WL 868666, at *6 (E.D. Pa. May 10, 2001) (citing Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001)); see also Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994) (An ALJ "must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.").  "[U]nless the Secretary has analyzed all evidence and has sufficiently explained the weight [she] has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979) (quoting Gober v. Mathews, 574 F.2d 772, 776 (3d Cir. 1978)); accord Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  "'Where there is conflicting probative evidence in the record, [courts] recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions.'"  Mason v. Barnhart, No. 04-0242, 2004 WL 3019319, at *2 (E.D. Pa. Dec. 28, 2004) (quoting Fargnoli, 247 F.3d at 42).

In the present case, the ALJ's decision is lacking in evidentiary support, her explanation for her conclusion is minimal and conclusory, and her description of the record is misleading. Other than with regard to a one-week inpatient voluntary commitment, the record lacked any records from Davis' mental-health treatment providers, so that the medical evidence regarding Davis' mental health was limited essentially to the opinions of the consulting examiner, Dr. Baker, and the State agency physician, Dr. Ondis.  As described supra in Section V(B)(1), both

doctors opined that Davis suffered from moderate or marked limitations[8] in a number of significant work-related mental abilities. Dr. Baker found Davis to have moderate limitations in the ability to understand and remember complex instructions and marked limitations in the abilities to carry out such instructions and to make judgments on complex work-related decisions. R. at 392. He indicated that Davis was markedly limited in the ability to respond appropriately to usual work situations and to changes in a routine work setting. Id. at 393. Dr. Ondis found Davis to have mild limitations in the ability to interact appropriately with coworkers, supervisors and the general public. Id. Dr. Ondis further opined that Davis had moderate limitations in her ability to understand and remember detailed instructions and to carry out such instructions. Id. at 71. He also determined that Davis was moderately limited in her abilities to: complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. Id. at 72. Both "responding appropriately to supervision, co-workers and usual work situations" and "dealing with changes in a routine work setting" are abilities that the Commissioner has identified as among the basic "mental activities . . . generally required by competitive remunerative unskilled work." SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996). Notably, the ALJ did not limit Davis in her RFC to only unskilled work, but instead found her capable of performing the full range of

---

[8]    The Commissioner's form for mental Medical Source Statements defines mild limitations as "[t]here is a slight limitation in this area, but the individual can generally function well." R. at 392. It defines moderate limitation as "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." Id. It defines marked limitations as "[t]here is serious limitation in this area. There is a substantial loss in the ability to effectively function." Id.

light work without any skill limitations or any other mental-health related limitations.  See R. at 23.

Nevertheless, the ALJ found that Davis suffered only mild limitations in concentrating, persisting or maintaining pace and in interacting with others and that she had no limitations in understanding, remembering or applying information and in adapting or in managing oneself.  Id. Based on those findings, she failed to include any provision in Davis' RFC to address Davis' mental limitations.  Id. at 24.  The ALJ reached those conclusions even though they were inconsistent with the only medical opinions on record.  "Surveying the medical evidence to craft an RFC is part of the ALJ's duties."  Titterington v. Barnhart, 174 F. App'x. 6, 11 (3d Cir. Pa. 2006).  However, in this case, the ALJ did not reach an informed analysis of medical opinions based on other competent medical evidence in the record, such as treatment notes.  She, instead, rejected all of the medical opinion evidence in the record and, in the absence of any evidence from Davis' treating mental-health providers, appears to have crafted an RFC containing no mental-health related provisions based on little more than her own disbelief in those medical opinions.  For an ALJ to reject all of the competent medical opinions in the record based on her own opinion regarding the claimant's mental abilities is impermissible.  Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000).

The most glaring deficiency in the ALJ's decision—one that by itself requires remand— is the ALJ's failure even to mention Dr. Ondis' opinion, let alone to address his conclusions.  Dr. Ondis' opinion clearly stated some significant limitations on Davis' mental abilities.  The ALJ, therefore, was obligated to "provide some explanation for a rejection of [this] probative evidence which would suggest a contrary disposition."  Adorno, 40 F.3d at 48.  Moreover, Dr. Ondis' opinion was largely consistent with Dr. Baker's in finding that Davis had significant mental

limitations.  It provided additional support for Dr. Baker's opinion and raised the level of

justification that the ALJ was required to provide for her decision, contrary to the opinions of

both of the medical professionals who evaluated Davis, that Davis' RFC did not include any

mental limitations of any kind.[9]  Because the ALJ failed to address this medical opinion evidence

in formulating an RFC that contained no provisions to address Davis' mental impairments, such

as a limitation to unskilled work, provisions limiting changes in work setting or routine, or

provisions restricting Davis' contact with coworkers, supervisors and the general public, remand

is required.[10]  See Rodriguez v. Astrue, No. 10-CV-3203, 2012 WL 5494659, at *3 (E.D. Pa.

---

[9]    For example, the Commissioner argues that it was appropriate for the ALJ to disregard Dr.
Baker's opinion because it was given on the Commissioner's form without any material
explanation for Dr. Baker's findings.  Def.'s Br. (Doc. No. 15) at 7-8.  Even apart from the fact
that Dr. Baker's opinion included a relatively lengthy narrative discussion of Davis' symptoms,
see R. at 388-91, Dr. Ondis' opinion contained narrative explanations as to each of the limitation
ratings he assigned to Davis that would have offered some support to Dr. Baker's ratings of
Davis' mental impairments, see id. at 71-73.

[10]    The Commissioner argues that any error in step two of the sequential analysis is harmless
because the ALJ found that Davis had physical limitations and proceeded through the analysis to
determine her RFC at step four, citing to Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145
n.2 (3d Cir. 2007).  Def.'s Br. at 8-9.  While the Commissioner's citation to Salles is accurate,
the justification for the rule he cites is that, in determining a claimant's RFC at step four, the ALJ
is required to consider the combined effect of all of the claimant's impairments, both severe and
non-severe.  Rosa v. Berryhill, No. 2:16-cv-5923, 2018 WL 1442893, at *5 (E.D. Pa. Jan. 31,
2018); McClease v. Comm'r of Soc. Sec., No. 08-1673, 2009 WL 3497775, at *10 (E.D. Pa. Oct.
28, 2008); Holcomb v. Astrue, No. 07-863, 2008 WL 3539987, at *5 (W.D. Pa. Aug. 13, 2008);
20 C.F.R. § 1545(a)(2).  "However, where it appears that the ALJ's error at step two also
influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the
Commissioner for further consideration."  McClease, 2009 WL 3497775, at *10.  Here, the ALJ
analyzed Davis' mental impairments at step two and found them non-severe.  See R. at 22-23.
Although the ALJ did repeat her characterization of Davis' activities of daily living at the
conclusion of her step four analysis, she did not conduct any analysis of why those activities
established that Davis' RFC need not contain any mental-health related limitations whatsoever.
See id. at 26.  She did not discuss any of the medical evidence regarding Davis' mental
impairments in her discussion of step four, id., but instead relied solely on her step-two analysis
for excluding any mental-health related limitations from Davis' RFC.  Thus, her erroneous
failure to consider Dr. Ondis' opinion was not remedied at step four, and this Court cannot be

(Footnote continued on next page)

Apr. 2, 2012) ("An ALJ is required to consider and discuss all probative evidence detailing whether a claimant suffers from an impairment that could affect his or her ability to perform work-related activities" (citing Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 201 (3d Cir. 2008))), report and recommendation adopted, No. 10-3203, 2012 WL 5503425 (E.D. Pa. Nov. 13, 2012)); see also Burnett, 220 F.3d at 121 ("The ALJ did err by reason of his failure to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination.").

The Commissioner argues that the ALJ's failure to address one of the only two medical opinions of record is harmless error because Davis cannot show that the ALJ's decision would have been different if she had considered it. Def.'s Br. at 9. That argument is meritless. First, it is entirely speculative. If the ALJ had properly considered that both of the two medical opinions that formed virtually all of the relevant medical evidence regarding Davis' mental health determined that she had significant work-related mental limitations, it would have been more difficult for her to justify her decision not to include any mental-health related limitations in Davis' RFC. Moreover, as discussed infra, the ALJ's existing analysis does not justify that conclusion.

The ALJ's decision to disregard the two medical opinions that addressed Davis' mental-health impairments also undercuts the evidentiary value of the vocational expert's ("VE")

---

assured that her failure to properly consider that opinion was harmless. See Slotcavage v. Berryhill, No. 3:18-CV-1214, 2019 WL 2521634, at *6, *10 (M.D. Pa. June 3, 2019) (erroneous decision at step two that impairment was not severe was not harmless because it contributed to the ALJ's decision to formulate an RFC that exceeded the limitations found by the medical opinions in the record); McClease, 2009 WL 3497775, at *11 (failure to discuss medical evidence of uterine condition at step two was not harmless because ALJ apparently relied on finding non-severity at step two in failing to include any provisions for it in hypotheticals to vocational expert).

testimony. The VE testified at the hearing that, if Davis' RFC included all of the limitations found by Dr. Baker, she would not be capable of gainful employment. See R. at 59-60. The ALJ did not question the VE regarding the availability of work for a person with the limitations found by Dr. Ondis or with any other set of mental-health related limitations. The only other hypothetical that the ALJ posed to the VE was based on the assumption that Davis had no exertional limitations, no mental limitations and only postural limitations. See id. at 60-61. While it is possible that, if the ALJ had found Davis had mental limitations, but that they were less severe than those Dr. Baker had assigned her, the VE still might have testified that Davis remained capable of performing her past relevant work as a cashier,[11] the record is simply devoid of evidence on that point. As a result, the VE's responses to the ALJ's only two hypotheticals did not provide substantial evidence to support a finding that Davis could perform her past work. See Rutherford, 399 F.3d at 553-54 (to serve as an evidentiary basis for a decision, a hypothetical to a VE must include all of the claimant's medically-supported limitations); McClease, 2009 WL 3497775, at *11 (failure to consider medical opinions in finding impairment not severe at step two that resulted in failure to address the impairment in hypothetical to VE meant that the ALJ's decision was not supported by substantial evidence). Thus, there is no sound evidentiary basis on which to conclude that the ALJ's decision not to

---

[11]    Davis also contends that the ALJ erred in determining that her work as a cashier was past relevant work for Social Security purposes. See Pl.'s Br. at 8-12. Because this matter must be remanded due to the ALJ's failure to address Dr. Ondis' opinion or to adequately explain her justification for not including any mental-health related limitations in Davis' RFC, it is not necessary to resolve this disputed issue. If Davis maintains that her work as a cashier did not qualify as past relevant work for Social Security purposes, she may clarify the record regarding her prior employment on remand.

include any mental-health related limitations in Davis' RFC did not affect the outcome of this case.

Furthermore, the limited justification the ALJ gave for according Dr. Baker's opinion little weight and replacing it with her own is not supported by substantial evidence. In making her decision not to include mental limitations in Davis' RFC, the ALJ relied almost entirely on her statement of Davis' activities of daily living. See R. at 22-23, 26. Her recounting of those activities, however, was less than fair or accurate. The ALJ justified her own ratings of Davis on the "B" criteria, which rated Davis' mental limitations as "mild" or "none," by asserting that Davis "was able to do household chores including cooking, cleaning, sweeping, mopping and doing laundry." Id. at 23 (citing id. at 233-39). She based that assertion on the Function Report form that Davis filled out in connection with her application. See id. Her statement, however, is a mischaracterization of the record.

Davis stated in her Function Report that she spent the day doing "nothing much" and that she generally stayed in her home most of the day being very depressed and not wanting to do anything. Id. at 233. Her hearing testimony was consistent with that description. See id. at 45-46, 48. Davis lived in a home rented by her adult brother. Id. at 168, 388. Although she had three children who lived with her, they were ages 12, 16 and 17, id. at 388, and, therefore, they too were able to participate in household chores. See id. at 390. Thus, although the ALJ repeatedly relied on her finding that Davis "was able to do household chores including cooking, cleaning, sweeping, mopping and doing laundry," id. at 23, 26, what Davis actually stated on the Function Report was that, as to taking care of her children, her activities were "very limited but [she] overs[aw] them in cooking, washing and going to school," id. at 233. As to cooking, Davis reported that she "sometimes" prepared her own meals, but that preparation consisted of making

sandwiches or microwaving frozen meals.  Id.  As to household chores, Davis reported that

"most of house work [was] done by [her] kids."  Id. at 234.  Davis did state that she shopped for

food approximately twice monthly, but also stated that she always had someone accompany her

when she did so.  Id. at 235.

Similarly, Davis reported to Dr. Baker that she required assistance with "cooking and

food preparation, cleaning, laundry, and shopping."[12]  Id. at 390.  She stated that she obtained

that assistance from her children, mother and siblings.  Id.  Similarly, the ALJ relied on her

assertion that Davis "was generally able to take care of her personal needs without assistance."

Id. at 26.  What Davis actually reported in her Function Report was that she had difficulties in

handling her personal care.  See id. at 233.  Davis similarly reported to Dr. Baker that she

required assistance with dressing, bathing, and grooming.  Id. at 390.

The ALJ also stated as a basis for her decision that Dr. Baker "found no significant

abnormalities" in his examination.  Id. at 22.  This assertion is difficult to justify in light of the

VE's testimony that a person who had the mental limitations that Dr. Baker assigned to Davis

would be incapable of any gainful employment.  Id. at 59-60.

The ALJ also relied on the fact that, starting in September 2015, Davis began a course of

training as a medical assistant, which she completed successfully nine months later.  Id. at 23.

While this fact is certainly worthy of consideration in evaluating Davis' RFC, the ALJ neglected

---

[12]     Although it is true that Dr. Ondis stated that the reason for Davis' inability to perform these
activities independently was due to her physical limitations, R. at 390, that fact does not justify
the ALJ's statement that Davis was able to perform them without mentioning any need for
assistance, see id. at 23.  It especially does not justify her reliance on Davis' purported ability to
perform these household chores as the basis for the ALJ's ratings of the "B" criteria or for her
resulting decision not to include any provisions in Davis' RFC to address her mental-health
limitations.

to mention that the course was given in a night school setting, which presumably involved a considerably smaller time commitment than a forty-hour workweek. The ALJ failed to explain how Davis' ability to manage such a limited time-commitment established that she was capable of completing a full workweek on a sustained basis. See Horak v. Colvin, No. 14-1510, 2016 WL 1276474, at *4 (W.D. Pa. Mar. 30, 2016) (the ability to engage in substantial gainful activity means the ability "to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or other similar schedule" (internal quotation marks omitted); Shedden v. Astrue, No. 4:10-CV-2515, 2012 WL 760632, at *10 (M.D. Pa. Mar. 7, 2012) (same). Moreover, the time period at issue here is from April 1, 2013 to September 11, 2016. The ALJ did not address how Davis' ability to complete a part-time night school course starting in September 2015 established that she was not disabled for any of the first two and one-half years of that period. There is certainly at least some evidence in the record that would suggest the opposite, including Davis' two suicide attempts in January and February 2014, R. at 398, and her April 2015 hospitalization, at the beginning of which her doctors rated her GAF score at 20, id. at 397.

While the ALJ was not required to credit Davis' self-reporting regarding these matters, it was improper for her to mischaracterize Davis' activities of daily living and then to rely on that mischaracterization as the basis for rejecting the "B" criteria ratings of two medical professionals in favor of ratings that she assigned herself. See id. at 23.

The most disquieting aspect of the ALJ's explanation for her rejection of the two medical opinions in the record is her statement that "[t]here is no record of [Davis] receiving any ongoing mental-health treatment from a mental-health professional." Id. at 22. While it is true that, other than for the one-week hospital stay in April 2015, the record does not contain treatment notes from a mental-health provider, it does contain numerous references both to her treatment by a

therapist, see, e.g., id. at 47, 208, 388, 398-99, and by a psychiatrist, see, e.g., id. at 48-49, 206, 388, 398, throughout the relevant period.  Davis listed her mental-health provider, Cognitive Behavioral Services, in her disability report, id. at 208, divulged the names of her psychiatrist and therapist to Dr. Baker, id. at 388, and testified regarding them at the hearing before the ALJ, id. at 47.  Indeed, Davis' counsel submitted a letter approximately one week prior to the hearing, requesting that the ALJ hold the record open to allow additional time for records to be obtained from Cognitive Behavioral Services.  Id. at 272.  No such records, however, were ever submitted.

"'[A] claimant represented by counsel is presumed to have made his [or her] best case before the ALJ.'"  Vivaritas v. Comm'r of Soc. Sec., 264 F. App'x 155, 158 (3d Cir. 2008) (quoting Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007)).  Nevertheless, "'[t]he burden to develop the record is shared between the claimant and the ALJ.'"  Snelson v. Colvin, No. 2:13-CV-06695-LDD, 2015 WL 5883127, at *5 (E.D. Pa. Aug. 18, 2015) (quoting Holmes v. Barnhart, No. 04-5765, 2007 WL 951637, at *7 (E.D. Pa. Mar. 26, 2007)), report and recommendation adopted, No. 2:13-CV-6695, 2015 WL 5818511 (E.D. Pa. Oct. 6, 2015).  This is because "Social Security proceedings are inquisitorial, not adversarial and, 'it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'"  Facyson v. Barnhart, No. 2:02-CV-03593-ECR, 2003 WL 22431937, at *7 (E.D. Pa. Feb. 27, 2003) (quoting Sims v. Apfel, 530 U.S. 103, 120 (2000)), report and recommendation adopted, No. 02-3593, 2003 WL 22436274 (E.D. Pa. May 30, 2003), aff'd, 94 F. App'x 110 (3d Cir. 2004).  That duty applies even when a claimant is represented by counsel.  Boone v. Barnhart, 353 F.3d 203, 208 (3d Cir. 2003); Rutherford, 399 F.3d at 557.  Thus, although it is ultimately the claimant's burden to present evidence establishing his or her disability, Wert v. Comm'r of

Soc. Sec., No. 13-5705, 2015 WL 1808594, at *12 (E.D. Pa. Apr. 21, 2015), an ALJ still has the duty to ensure that the record is sufficient to make a "sound determination" regarding the claimant's application for benefits, Ferguson v. Schweiker, 765 F.2d 31, 36 (3d Cir. 1985); Watkins v. Colvin, No. 3:16-CV-367, 2016 WL 4679015, at *13 (M.D. Pa. Sept. 7, 2016); Manning v. Sec'y of Health & Human Servs., 881 F. Supp. 201, 204 (W.D. Pa. 1995). "Where there are obvious gaps in the record, the ALJ has the duty to develop the administrative record with respect to the missing evidence." Reyes v. Berryhill, No. 17-390, 2018 WL 1211506, at *2 (W.D. Pa. Mar. 8, 2018). The absence of records from a treating physician can create such a gap. Cochran v. Berryhill, No. 18-252, 2019 WL 4093531, at *4 (W.D. Pa. Aug. 29, 2019). Where the evidentiary gap prejudices the claimant, remand is required. Id.

In the present case, there is serious doubt whether the ALJ fulfilled her obligation to ensure that the record was sufficient to support a sound decision regarding Davis' mental-health impairments. The ALJ essentially disregarded the opinion of the consultative examiner who was the only mental-health professional of record to actually examine Davis in person. See R. at 22-23. She did not even mention the opinion of the State agency physician. Instead, she reached her own contrary decision that Davis' mental impairments were not severe and did not require any limitations be placed in Davis' RFC to address them. She did so even though she clearly was aware, both from the records cited above and from Davis' testimony at the hearing, id. at 47-48, as well as from Davis' counsel's letter, id. at 272, that Davis had been under the care of a psychiatrist and a therapist at Cognitive Behavioral Services during the closed period in question. She also knew that Davis' psychiatrist had considered her condition sufficiently severe as to require the prescription of psychotropic medications. See, e.g., id. at 48-49, 206, 388, 399.

Thus, she was aware of a significant gap in the record regarding Davis' mental-health treatment—there were simply no records in the administrative record from her mental-health treatment providers. The ALJ had reason to believe that those treatment records, which were relatively recent, would likely still be available. Although the ultimate obligation to present medical evidence fell on Davis and her counsel, the ALJ still retained the obligation to ensure that the record provided a sufficient evidentiary basis for her to reach a "sound decision," Ferguson, 765 F.2d at 36, and that her decision was supported by substantial evidence, Schwartz, 134 F. Supp. 2d at 647. "Ultimately, the question is whether the administrative record has been adequately developed under the circumstances to provide a substantial basis for the decision." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Given that she rejected the opinions of the only two medical professionals who had offered opinions regarding Davis' mental health and that, other than for the one-week inpatient hospital treatment, the record did not contain any treatment records from Davis' treating mental-health providers of whom the ALJ was aware, the ALJ's decision not to include any restrictions in Davis' RFC to address Davis' mental impairments was not supported by substantial evidence. On remand, Davis' counsel, with the assistance of the ALJ, should obtain the treatment records from Davis' mental-health providers. If the ALJ again determines that the only two medical opinions in the record should be disregarded, she must provide a sounder evidentiary basis for doing so.

## VI.     CONCLUSION

For the reasons set forth above, I find that the ALJ's findings are not supported by substantial evidence. Accordingly, Plaintiff's Request for Review is granted. The matter will be remanded to the Commissioner for further proceedings consistent with this Memorandum

Opinion, including a hearing before a different ALJ than the one who previously reviewed

Davis' application; one who has been properly appointed pursuant to the Appointments Clause

of the United States Constitution.  An appropriate Order follows.

Dated: October 31, 2019

BY THE COURT:

*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE